Ali Salamirad (SBN 209043)
Jeffrey D. Hook (SBN 216229)
**SMTD LAW LLP**
17901 Von Karman Avenue, Suite 500
Irvine, California 92614
949-537-3800
949-537-3822 (f)
as@smtdlaw.com; jh@smtdlaw.com

Attorneys for Plaintiff
LIBERTY MUTUAL INSURANCE COMPANY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY, a Massachusetts corporation,<br><br>Plaintiff,<br><br>v.<br><br>EMILY GRENE CORP., a California corporation; BURKE H. EWERS, an individual; ADRIENNE L. EWERS, an individual, and DOES 1 through 30, inclusive,<br><br>Defendants. | **CASE NO. 2:23-cv-6102**<br><br>*Unlimited Jurisdiction*<br><br>**COMPLAINT FOR:**<br><br>**(1) BREACH OF CONTRACT – INDEMNITY AGREEMENT;**<br><br>**(2) STATUTORY REIMBURSEMENT; and**<br><br>**(3) *QUIA TIMET*** |

Plaintiff LIBERTY MUTUAL INSURANCE COMPANY ("LIBERTY") alleges the following against Defendants Emily Grene Corp., Burke H. Ewers, and Adrienne L. Ewers (collectively, referred to as the "Indemnitors/Defendants" all of whom are jointly and severally liable to LIBERTY).

## PARTIES

1.     LIBERTY is a corporation incorporated under the laws of the State of Massachusetts, with its principal place of business in Boston, Massachusetts. LIBERTY is, and at all relevant times was, qualified and authorized to transact business in the State of California as a surety.

2.     Defendant Emily Grene Corp. ("EGC") is a corporation incorporated under the laws of the State of California, with its principal place of business in San Dimas, California.

3.     Defendant Burke H. Ewers is an individual who at all relevant times has resided in La Verne, California.

4.     Defendant Adrienne L. Ewers is an individual who at all relevant times has resided in La Verne, California.

5.     The names and capacities, whether corporate, individual or otherwise, of defendants named in this Complaint as DOES 1 through 30, inclusive, are unknown to LIBERTY.  LIBERTY is informed and believes and thereon alleges that each of the fictitiously named Defendants is liable to LIBERTY on the causes of action herein alleged and, therefore, LIBERTY sues said Defendants by their fictitious names.

6.     LIBERTY is informed and believes and thereon alleges that at all times herein mentioned, the Defendants, and each of them, was an agent, servant, employee, co-conspirator and/or joint venturer of every other of the remaining Defendants, and performed the acts and omissions complained of herein in the course and scope of such agency, service, employment, conspiracy and/or joint venture.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because: (i) there is complete diversity of citizenship between LIBERTY and Defendants, since LIBERTY is a citizen of the State of Massachusetts for diversity purposes and the Defendants are all citizens of States other than Massachusetts, and (ii) the amount in controversy exceeds $75,000, exclusive of interest and costs.

/ / /

/ / /

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to LIBERTY's claims occurred within the Central District of California.

## GENERAL ALLEGATIONS

9.     Indemnity Company of California ("ICC") was, and at all times mentioned herein was, a corporation organized under the laws of the State of California, engaged in the business of underwriting surety bonds.   At all times mentioned herein, ICC was duly qualified to conduct business as a surety within the State of California.

10.    On or about August 16, 2013, to induce ICC to issue the Bonds, and as partial consideration for the Bonds, the Indemnitors/Defendants executed an Indemnity Agreement in favor of ICC under which they promised to completely indemnify and hold ICC harmless from all damage, loss or expense ICC incurs as a result of having issued the Bonds. A true and correct copy of the Indemnity Agreement is attached hereto as **Exhibit "1"** and incorporated herein by this reference.

11.    EGC entered into numerous written contracts to perform public works of improvement in California that required EGC to comply with the State's prevailing wage laws.

12.    ICC issued a payment bond on behalf of EGC for the Student Center Lighting Phase 2 Project, Bond 3677494P, with a penal sum of $391,863.  The Ohio Casualty Insurance Company ("OCIC"), an affiliate of LIBERTY, issued payment bond on behalf of EGC for the CRII Gateway Study Center Lighting Project, Bond 36K000015, with a penal sum of $87,270 (collectively, the "Projects").

13.    In 2019, LIBERTY purchased elements of ICC, including ICC's surety business and the account of EGC, and all of ICC's indemnity rights, including the subject Indemnity Agreement, were assigned to LIBERTY and its affiliates

("Assignment"). A true and correct copy of the Assignment is attached hereto as **Exhibit "2"** and is incorporated herein by this reference. By Assumption of Liability Riders effective on or about July 26, 2019, ICC was replaced as Surety by OCIC on the aforementioned payment bond for the Student Center Lighting Phase 2 Project, Bond 3677494P.

14. ICC was named as a defendant in a civil action entitled *Doyel, et al. v. Emily Grene Corp. et al*., Case No. 20STCV45137 in the Superior Court of Los Angeles County wherein the four Plaintiffs who worked on the Projects asserted claims on the Bonds ("Civil Action").

15. On or about May 15, 2023, ICC entered into a settlement agreement with the Plaintiffs in the Civil Action that resulted in ICC paying $275,000 to resolve Plaintiffs' claims on the payment bonds.

16. LIBERTY has also incurred attorneys' fees and costs in the amount of $31,000 in its defense of the Civil Action and pursuing its indemnity rights, all of which LIBERTY is entitled to recover under the Indemnity Agreement.

17. As of the date of this filing, the Indemnitors/Defendants, and each of them, refuse and continue to refuse to satisfy and discharge their obligation to indemnify and hold LIBERTY harmless under the Indemnity Agreement.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract –Indemnity Agreement

### Against the Indemnitors/Defendants and DOES 1-30)

18. LIBERTY re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

19. The Indemnitors/Defendants have failed, and continue to fail to collateralize, exonerate, indemnify and hold LIBERTY harmless from and against all losses as a result of having issued the Bonds, which are the Indemnitors/Defendants' express obligations under the clear and unambiguous terms of the Indemnity Agreement.

SMTD Law LLP
A LIMITED LIABILITY
PARTNERSHIP

20.    The Indemnitors/Defendants have failed and continue to fail to secure LIBERTY's discharge of its obligations under the Bonds as required under the clear and unambiguous terms of the Indemnity Agreement.

21.    LIBERTY has performed, or has been excused from performing, all of the terms, covenants and conditions on its part to be performed under the Indemnity Agreement, if any.

22.    LIBERTY has incurred and will continue to incur losses as a result of the Indemnitors/Defendants' material breaches of the Indemnity Agreement.

23.    As a result of the Indemnitors/Defendants' material breaches of the Indemnity Agreement, LIBERTY has suffered a current loss of $306,000 as a result of having issued the Bonds.

24.    Because the Indemnitors/Defendants have breached their obligations under the Indemnity Agreement, LIBERTY has been forced to retain counsel to enforce its rights to payment under the Indemnity Agreement and otherwise assist with the investigation and resolution of claims against the Bonds.  The terms of the Indemnity Agreement provide that in the event of legal action to enforce provisions, the Indemnitors/Defendants, promise to pay all costs, expenses and attorney's fees incurred by LIBERTY.

## SECOND CLAIM FOR RELIEF

### (Statutory Reimbursement Against the Indemnitors/Defendants and DOES 1-30)

25.    LIBERTY re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

26.    LIBERTY is informed and believes and thereon alleges that under California Civil Code section 2847, if a surety satisfies a principal's obligation, or any part thereof, whether with or without legal proceedings, the principal is obligated to reimburse the surety for all disbursements, including, but not limited to, attorneys' fees, costs and other expenses.

27.     LIBERTY is informed and believes and thereon alleges that as a result of ICC having issued the Bonds, LIBERTY has incurred losses of no less than $306,000 to resolve valid claims against the Bonds.  Under California Civil Code section 2847, the Indemnitors/Defendants and DOES 1-30 are now required to reimburse LIBERTY.

## THIRD CLAIM FOR RELIEF

### (*Quia Timet* Against Defendants Indemnitors/Defendants and DOES 1-30)

28.     LIBERTY re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

29.     The Indemnitors/Defendants, and each of them, are obligated under the established and recognized equitable doctrine of *Quia Timet* to post collateral security with LIBERTY to protect LIBERTY from for all losses and expenses to be incurred by LIBERTY as a consequence of having issued the Bonds.

30.     LIBERTY is informed and believes and thereon alleges that Indemnitors/Defendants will attempt to avoid their obligations to indemnify and hold LIBERTY harmless under the terms of the Indemnity Agreement by transferring and conveying their assets to satisfy obligations other than those covered by the Bonds and the Indemnity Agreement.

31.     LIBERTY has no adequate remedy at law for the injuries currently being suffered.  If the Indemnitors/Defendants are not immediately enjoined from transferring their assets, the assets will be disposed of permanently, and the Indemnitors/Defendants will render themselves insolvent, to the severe and irreparable prejudice of LIBERTY such that judgment for monetary damages would be of no value.

32.     As a proximate result of the conduct of Indemnitors/Defendants, and each of them, LIBERTY has been or will be damaged so long as said Indemnitors/Defendants are able to circumvent their obligations to LIBERTY under the Indemnity Agreement by transferring their assets to avoid their obligations.

SMTD Law LLP
A LIMITED LIABILITY
PARTNERSHIP

33.     The Indemnitors/Defendants, and each of them, are obligated under the Indemnity Agreement to provide information and documentation deemed necessary by LIBERTY to investigate claims on the Bonds, and they failed to do so upon request from LIBERTY.

34.     LIBERTY is entitled to a temporary restraining order, a preliminary injunction and a permanent injunction, all enjoining Indemnitors/Defendants, and each of them, as well as their agents, servants, employees, attorneys and all persons acting under, in concert with, or for them, from further transferring assets without the express written consent and order of this Court.

## PRAYERS FOR RELIEF

WHEREFORE, LIBERTY prays for judgment in this action against other Indemnitors Defendants as follows:

## FIRST CLAIM FOR RELIEF AGAINST
## INDEMNITORS/DEFENDANTS and DOES 1-30

a)     Compensatory damages in an amount to be proven at trial, but no less than $306,000;

b)     Pre-judgment and post-judgment interest on such amount at the maximum legal rate;

c)     Attorneys' fees and costs incurred herein; and

d)     Such other relief as the Court deems just and proper.

## SECOND CLAIM FOR RELIEF AGAINST
## INDEMNITORS/DEFENDANTS AND DOES 1-30

On the Second Cause of Action for damages in an amount of $306,000, including costs according to proof at time of trial along with any such further and additional relief as determined just by the court.

/ / /

/ / /

/ / /

1
2

<u>**THIRD CLAIM FOR RELIEF AGAINST**</u>

<u>**INDEMNITORS/DEFENDANTS AND DOES 1-30**</u>

3
4

a)    For a temporary restraining order, preliminary injunction and permanent injunction enjoining Indemnitors/Defendants from transferring assets;

5
6

b)    A preliminary injunction and permanent injunction for the following relief:

7
8

1.    Indemnitors/Defendants be enjoined and restrained from selling, transferring disposing, liening, encumbering, or impairing their assets and property;

9
10
11
12

2.    Indemnitors/Defendants be required to provide LIBERTY immediate access to their books, records, accounts, databases, and other documents an information in order to prevent Indemnitors/Defendants from selling, transferring disposing, liening, encumbering, or impairing their assets and property;

13

c)    Attorneys' fees and costs incurred herein; and

14

d)    Such other relief as the Court deems just and proper.

15

Dated:  July 27, 2023          **SMTD LAW LLP**

16
17
18
19
20

By:   /s/ Ali Salamirad
       Ali Salamirad
       Jeffrey D. Hook
       Attorneys for Plaintiff
       LIBERTY MUTUAL INSURANCE
       COMPANY

21
22
23
24
25
26
27
28

# EXHIBIT "1"



# INSCO *XPRESS* CONTRACT APPLICATION

☐ Corporation   ☐ Proprietorship   ☐ Partnership
☐ LLC   ☐ LLP   ☐ Other

## CONTRACTOR INFORMATION

Principal/Company: __Emily Grene Corp__   Contractor's License No: __975808__

Address: __358 E. Foothill Blvd. Suite 200 San Dimas, CA 91773__   Phone Number: __626-513-8705__
(Street, City, State, Zip)

Year Company Started: __2012__   Operations Under Current Management Since: __2012__   Net Worth: $ _____

Type of Construction Performed: __Energy Efficiency Services__   Operating Territory: __California__

Largest Completed Contract Price: $ __350,000__   Gross Profit: $ __$125,000__   Year Completed: __2013__

Description: __Lighting Upgrade Project__

Total Current Work On Hand:   Number of Jobs: __2__   Estimated Cost to Complete: $ __60,000__

| | Yes | No |
|---|---|---|
| • Has the company ever failed to complete a contract? | ☐ | ☒ |
| • Has the company, any stockholder, owner, partner or any affiliate ever filed for bankruptcy or been placed in receivership? | ☐ | ☒ |
| • Are there any liens filed against the company's or related entity's projects? | ☐ | ☒ |
| • Are you involved in any litigation or been delinquent in payroll, state or federal taxes within the past three (3) years? | ☐ | ☒ |
| • Has the company, any officer, owner or partner been in claim with a surety? | ☐ | ☒ |
| • Are any assets held in trust or pledged to creditors? | ☐ | ☒ |
| • Has the applicant, or any of it's owners, applied for or obtained other bonds within the last twenty-four (24) months? | ☐ | ☒ |

Explain all "Yes" answers: _____

## OWNER / INDEMNITOR INFORMATION

Provide information on all Owners and their respective spouses:

| Name and Email Address | Address (No P.O. Boxes) | | Date of Birth | Social Security # | Net Worth | % of Ownership | Years in Construction | Title | |
|---|---|---|---|---|---|---|---|---|---|
| Owner: Adrienne L . Ewers | 2717 MaryAnn Manor | ☒ own | | | | 51 | 5 | CFO | Pres |
| Email Address: | La Verne, CA 91750 | ☐ rent | | | | | | | |
| Spouse: Burke H Ewers | 2717 MaryAnn Manor | ☒ own | | | | 49 | 10 | CEO | |
| Email Address: | La Verne, CA 91750 | ☐ rent | | | | | | | |
| Owner: | | ☐ own | | | | | | | |
| Email Address: | | ☐ rent | | | | | | | |
| Spouse: | | ☐ own | | | | | | | |
| Email Address: | | ☐ rent | | | | | | | |

(If All Owners not listed, please attach additional application.)

## CONTRACT INFORMATION

Job Description: __University of California Irvine - Exterior Lighting Project__

Estimated Bid Price/Contract Price: $ __60,000__   Bid Date: __6/1/2013__   Anticipated Start Date: __8/20/2013__

Time For Completion: __12/30/2013__   Liquidated Damages: $ __N/A__   Warranty Period: __30 days__

Bid Results: 1) _____ /$ _____   2) _____ /$ _____   3) _____ /$ _____
Name   Amount   Name   Amount   Name   Amount

Obligee/Owner: __University of California Irvine__

Address: _____
(Street, City, State, Zip)

## BOND INFORMATION

Required Bid Bond Amount or Percentage: _____   Required Performance Bond Amount or Percentage: __50,000__

Required Payment Bond Amount or Percentage: _____   Required Maintenance Bond Amount or Percentage: _____

Required Bond Forms: _____

## AGENCY INFORMATION

Agency Name: _____   Agency Code: _____

Producer: _____   Length of Agency Relationship with Account: _____

Agency Recommendation: _____

Additional policies written for applicant or owners? _____   All premium current? ☐ ☐

The Insco/Dico Group
500 S. Kramer Boulevard, Suite 300, Brea, CA 92821
Phone: (714) 754-5660   Toll free: (855) 813-7239
Fax: (714) 494-1290
www.InscoDico.com

ID-1001 (CA-Inso) (REV. 11/12)   1

## INDEMNITY AGREEMENT - READ CAREFULLY

By signing this Indemnity Agreement ("Agreement") principal and each of the other undersigned (collectively "Indemnitors") affirm that the statements in the foregoing application ("Application") are true and are made to induce Developers Surety and Indemnity Company and/or Indemnity Company of California (hereinafter "Surety") to issue any and all bonds on behalf of principal or other Indemnitor (collectively "Bonds"). The term Bonds includes any bond issued before, on or after the date of this Agreement and any extension, renewal, modification or substitution of or addition to the Bonds. Each Indemnitor further affirms that he, she or it understands that Bonds are a credit relationship. Indemnitors jointly and severally agree, for themselves, their personal representatives, successors, and assigns:

1. To fully reimburse Surety and indemnify it against all liability, loss, claims, demands, attorneys fees, costs and expenses of every kind and nature (including for investigation) which Surety incurs or for which it may become liable as a consequence of issuing the Bonds (collectively "Loss"), regardless of whether the Surety has actually received a claim or paid any amount.
2. To pay Surety the initial, fully earned, premium and all subsequent renewals, extensions, or modifications.
3. Surety may, at its sole discretion, deny, pay, compromise, defend or appeal any claim or suit against the Bonds. An itemized statement of or sworn voucher from the surety attesting to the Loss shall be _prima facie_ evidence of the Loss.
4. If Surety, in its sole discretion, deems it necessary to protect itself from potential Loss it may demand collateral from Indemnitors in an amount Surety deems adequate. Indemnitors shall immediately deposit the full amount of collateral in cash or other acceptable form with Surety whether or not it has yet made a payment or incurred a Loss. Surety may retain the collateral until all actual or potential claims against the Bonds are exonerated and all Loss is fully reimbursed.
5. All money and other proceeds of the obligations covered by the Bonds ("Obligation") are received by Principal in trust for the benefit of Surety for the sole purpose of performing the Obligation until the Surety's liability is completely exonerated.
6. To secure Indemnitors' duties and obligations to Surety Indemnitors, upon Surety's declaration of principal's default, assign to Surety all right and title to and interest in all amounts due under the Obligation and under all other bonded and unbonded contracts; all agreements, notes, accounts, proceeds, accounts receivable, return premium from Surety or others in which Indemnitors have any interest; and all subcontracts under the Obligation.
7. Each Indemnitor irrevocably appoints Surety or its designee as his, her or its attorney-in-fact with the right and power, but not the obligation, to exercise all of the rights assigned to Surety under this Agreement and to make, execute and deliver any and all additional contracts, instruments, assignments, documents or papers (including, but not limited to, the endorsement of checks or other instruments payable to principal or any Indemnitor representing payment of Obligation monies) deemed necessary and proper by Surety in order to give full effect to the intent and meaning of the assignments or rights contained herein. It is expressly agreed that this power-of-attorney is coupled with the interest of Surety in receiving the indemnification from Indemnitors. Indemnitors hereby ratify all acts by Surety or its designee as attorney-in-fact.
8. Upon submission of the Application and until full satisfactory performance of the Obligation and exoneration of the Bonds, Surety may freely access, examine, copy and obtain Indemnitors' books, records, credit reports and accounts ("Records"). Indemnitors authorize third parties in possession of these Records to furnish to Surety any information requested in connection with any transaction.
9. Each Indemnitor agrees he, she or it is bound to every obligation in this Agreement regardless of (a) whether the principal fails to sign any bond; (b) the existence, release, return, exchange or viability of or failure to obtain collateral or security securing Indemnitors' duties and obligations under the Agreement; (c) the identity of any other Indemnitor; (d) whether or not any other Indemnitor is bound or released; or (e) the failure of any other person or entity to sign this Agreement.
10. Indemnitors expressly waive notice of any claim or demand against the Bonds or information provided to the Surety. Surety may decline to issue bonds and may cancel, withdraw or procure its release from the Bonds at any time, without incurring liability to Indemnitors.
11. As used in this Agreement, the plural and singular shall include each other as circumstances require. If any portion of this Agreement is unenforceable that portion shall be considered deleted with the remainder continuing in full force and effect.
12. A facsimile, photocopy, electronic or optical reproduction shall be admissible in a court of law with the same force and effect as the original.
13. This Agreement is a continuing obligation and may not be terminated for past or present bonds. Indemnitors may, however, terminate obligations as to future bonds by providing the Surety with a minimum of 30 days written notice mailed to: P.O. Box 19725, Irvine, CA 92623, via certified mail, return receipt requested.
14. As consideration for Surety's execution of the Bonds applied for, each Indemnitor jointly and severally agrees to be bound by all of the terms of this Agreement as though each were the sole applicant and each admits to being financially interested in the performance of the Obligation.

### SEE FRAUD WARNING ON PAGE 2

Signed this __16__ day of __August__ __2013__. Principal/Company Name (Print): __Emily Grene Corp__

Print Authorized Signatory's Name and Title here: __Adrienne Ewers - President__   Signature X _____

Indemnitors: __Adrienne Ewers__

Signature X _____   Signature X _____

(Indemnitor) Print Name here: __Adrienne Ewers__   (Spouse) Print Name here: __Burke Ewers__

Signature X _____   Signature X _____

(Indemnitor) Print Name here: _____   (Spouse) Print Name here: _____

Signature X _____   Signature X _____

(Indemnitor) Print Name here: _____   (Spouse) Print Name here: _____

Signature X _____   Signature X _____

(Indemnitor) Print Name here: _____   (Spouse) Print Name here: _____

Signature X _____   Signature X _____

(Indemnitor) Print Name here: _____   (Spouse) Print Name here: _____

ID-1061 (CA-Bros) (REV. 11/12)   3

# EXHIBIT "2"

EXECUTION VERSION

---

## ASSIGNMENT OF INDEMNITY RIGHTS AGREEMENT

by and among

**TECHNOLOGY INSURANCE COMPANY, INC.,**

**DEVELOPERS SURETY AND INDEMNITY COMPANY,**

**SECURITY NATIONAL INSURANCE COMPANY,**

**WESCO INSURANCE COMPANY,**

**INDEMNITY COMPANY OF CALIFORNIA, and**

**COREPOINTE INSURANCE COMPANY**

and

**LIBERTY MUTUAL INSURANCE COMPANY**


**Dated as of May 31, 2019**

---

**TABLE OF CONTENTS**

**Page**

ARTICLE I

DEFINITIONS

Section 1.1    Certain Defined Terms.................................................................. 2

ARTICLE II

ASSIGNMENT; ACCEPTANCE; PERFECTION

Section 2.1    Assignment ...................................................................... 4
Section 2.2    Illustrative Scope of Assignment ........................................... 4
Section 2.3    Limitation of Assignment ..................................................... 5
Section 2.4    Power of Attorney.............................................................. 5
Section 2.5    All Necessary Actions......................................................... 6
Section 2.6    Perfection ....................................................................... 6
Section 2.7    Hold Harmless ................................................................. 6

ARTICLE III

GENERAL PROVISIONS

Section 3.1    Interpretation................................................................... 6
Section 3.2    Entire Agreement ............................................................. 7
Section 3.3    Governing Law, etc............................................................ 7
Section 3.4    Assignment ..................................................................... 7
Section 3.5    Severability; Amendment; Modification; Waiver ................... 7
Section 3.6    Counterparts; Effectiveness; Third Party Beneficiaries........ 8

**ASSIGNMENT OF INDEMNITY RIGHTS AGREEMENT**

This ASSIGNMENT OF INDEMNITY RIGHTS AGREEMENT, dated as of May 31, 2019 (this "Agreement"), is made by and between, on the one hand, TECHNOLOGY INSURANCE COMPANY, INC., a Delaware domiciled stock property and casualty insurance company ("TIC"), DEVELOPERS SURETY AND INDEMNITY COMPANY, a California domiciled stock property and casualty insurance company ("DSIC"), SECURITY NATIONAL INSURANCE COMPANY, a Delaware domiciled stock property and casualty insurance company ("SNC"), WESCO INSURANCE COMPANY, a Delaware domiciled stock property and casualty insurance company ("WIC", and together with TIC, DSIC, SNC and AmTrust International Insurance Ltd., a Bermuda limited company, the "Pool Retrocedents"), INDEMNITY COMPANY OF CALIFORNIA, a California domiciled stock property and casualty insurance company ("ICC"), and COREPOINTE INSURANCE COMPANY, a Delaware domiciled stock property and casualty insurance company ("CIC"), and, on the other hand, LIBERTY MUTUAL INSURANCE COMPANY, a Massachusetts domiciled reorganized stock insurance company (the "Reinsurer").  Each of the Pool Retrocedents (other than AmTrust International Insurance Ltd., which is not a party hereto), ICC, CIC and the Reinsurer are sometimes individually referred to in this Agreement as a "party" and together as the "parties."

WHEREAS, the Reinsurer and AmTrust Financial Services, Inc. ("Seller") are parties to that certain Master Stock and Asset Purchase Agreement, dated as of April 15, 2019 (the "Master Agreement"), pursuant to which Seller agreed to sell, and the Reinsurer (as Buyer thereunder) agreed to acquire, the Acquired U.S. Surety Business (as defined in the Master Agreement);

WHEREAS, pursuant to the Master Agreement, the Reinsurer, the Pool Retrocedents, ICC and CIC have entered into that certain U.S. Surety Reinsurance Agreement, dated as of the date hereof (the "Reinsurance Agreement"), pursuant to which the Pool Retrocedents have ceded to the Reinsurer, and the Reinsurer has accepted and reinsured, the Reinsured Liabilities (as defined therein) on a one hundred percent (100%) indemnity reinsurance basis;

WHEREAS, pursuant to Section 5.4 of the Reinsurance Agreement, the Reinsurer has been vested with the authority to assign or transfer any AmTrust Party's right, title and interest in and to any Indemnity Agreement to Reinsurer or any of its Affiliates, subject to the receipt of any required consents and approvals; and

WHEREAS, the parties, pursuant to the terms and subject to the conditions hereof, desire to effectuate such assignments and transfers hereunder.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and upon the terms and conditions hereinafter set forth, the parties hereby agree as follows:

1

# ARTICLE I

## DEFINITIONS

SECTION 1.1     Certain Defined Terms.  For purposes of this Agreement, the following terms shall have the respective meanings set forth below:

"Affiliate" means, as of any given time, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with such Person.

"AmTrust Indemnitees" has the meaning set forth in Section 2.7.

"AmTrust Parties" means the Pool Retrocedents (other than AmTrust International Insurance Ltd.), ICC and CIC.

"Ancillary Agreement" has the meaning set forth in the Master Agreement.

"Assigned Property" has the meaning set forth in Section 2.1(a).

"Assignment" has the meaning set forth in Section 2.1(a).

"Bond" means any surety bond, undertaking, recognizance, guarantee, indemnity or other surety obligation, or any contract or policy evidencing the same, or any letter regarding surety bonding, together with all binders, slips, certificates, amendments, endorsements and riders thereto.

"Business Day" has the meaning set forth in the Reinsurance Agreement.

"Closing Date" means the "U.S. Closing Date" as defined in the Master Agreement.

"Contract" means, with respect to any Person, any agreement, contract, lease, license, instrument or other legally binding obligation to which such Person is a party or is otherwise subject or bound.

"Direct Writers" means DSIC, ICC, WIC and CIC.

"Effective Date" means June 1, 2019.

"Effective Time" means 12:00:01 a.m., New York time, on the Effective Date.

"Indemnity Agreement" means any Contract between any Direct Writer or any of its Affiliates, on the one hand, and the principal under any Reinsured Bond or any of its Affiliates, on the other hand, that provides for the indemnification or reimbursement of any Direct Writer or any of its Affiliates in respect of payments under any Reinsured Bond, together with any related collateral or security agreements, documents or instruments, guarantees or other forms of credit support (the "Collateral").

2

"Law" means any applicable law, statute, ordinance, rule, regulation, judgment, injunction, order or decree.

"Liberty Bonds" has the meaning set forth in Section 2.1(a).

"New Business Expiration Date" means the date that is fifteen (15) months following the date of the Reinsurance Agreement; provided, however, the Reinsurer may, upon the delivery of a New Business Extension Notice (as defined in the Reinsurance Agreement) to the Cedent Representative (each as defined in the Reinsurance Agreement), extend the date by an additional six (6) months to the date that is twenty-one (21) months following the date of this Agreement (the "Extended New Business Expiration Date").

"Person" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"Reinsured Bonds" means (a) all Bonds written by a Direct Writer prior to the Closing Date (other than any Bonds that constitute financial guarantee insurance under state insurance Laws, including Article 69 of the New York State Insurance Law) and administered in the "Surety Central" system managed by the Insco Insurance Services surety team in Irvine, California, and (b) all Bonds written by the Direct Writers on or following the Closing Date and prior to the New Business Expiration Date or the Extended New Business Expiration Date, as applicable (each as defined pursuant to the Reinsurance Agreement), that were issued at the direction or recommendation of Reinsurer as Administrator under the Reinsurance Agreement. For the avoidance of doubt, "Reinsured Bonds" shall not include any policies that constitute U.S. Contractor Liability Business (as defined in the Master Agreement).

"Reinsured Liabilities" has the meaning set forth in the Reinsurance Agreement.

"Subject Bonds" has the meaning set forth in Section 2.1(a).

In addition, the following terms shall have the respective meanings set forth in the following sections of this Agreement:

| Defined Term | Section Reference |
| --- | --- |
| "Agreement" | Preamble |
| "CIC" | Preamble |
| "DSIC" | Preamble |
| "ICC" | Preamble |
| "Master Agreement" | Recitals |
| "parties" | Preamble |
| "Pool Retrocedent" | Preamble |
| "Reinsurer" | Preamble |
| "Seller" | Recitals |
| "SNC" | Preamble |
| "TIC" | Preamble |
| "WIC" | Preamble |

ARTICLE II

ASSIGNMENT; ACCEPTANCE; PERFECTION

SECTION 2.1     Assignment; Acceptance.

(a)     The AmTrust Parties hereby assign, transfer and convey to the Reinsurer and its Affiliates, and their respective successors and assigns, as of the Effective Time, each of the AmTrust Parties' past, present and future rights, privileges, benefits and other interests arising under or relating to the Indemnity Agreements, including with respect to any amounts, proceeds or recoveries relating thereto or to Collateral in respect thereof (all of the foregoing, the "Assigned Property" and such assignment, transfer and conveyance, the "Assignment").  Such Assignment shall be valid (i) as respects Reinsured Bonds issued by the AmTrust Parties (A) prior to the Effective Time as well as (B) prior to the New Business Expiration Date (or Extended New Business Expiration Date, as applicable) and (ii) as respects Bonds written by the Reinsurer or its respective Affiliates in their own name on behalf of principals that are (or whose Affiliates are) parties to an Indemnity Agreement (such Bonds, "Liberty Bonds", and together with the Reinsured Bonds, "Subject Bonds").

(b)     The Reinsurer and its Affiliates, and their respective successors and assigns, herby accept the Assignment.

SECTION 2.2     Illustrative Scope of Assignment.  Without limitation of Section 2.1 or of any other rights, privileges, benefits or other interests arising under or relating to an Indemnity Agreement, the parties acknowledge and agree that the Assignment includes the right of the Reinsurer and its Affiliates, as assignees, to the fullest extent permitted by applicable Law and the terms of the applicable Indemnity Agreement:

(a)     to be indemnified in respect of any loss or expense (including interest thereon) pursuant to the terms of the applicable Indemnity Agreement;

(b)     to pay, compromise, defend, settle, investigate, appeal or handle any claim, suit or demand arising out of or relating to any Subject Bond (subject to any applicable provisions of the Reinsurance Agreement);

(c)     to be held harmless from, and defended against, any lawsuit, arbitration or proceeding with respect to any Subject Bond;

(d)     to receive, upon demand, cash or other collateral reasonable acceptable to the assignee in respect of any Subject Bond;

(e)     for all funds due or that may become due to the assignee in respect of any Subject Bond to be held in trust for its benefit;

(f)     to exercise all available rights and remedies against a principal or other indemnitor upon a default;

(g)   to be the beneficiary of any assignment by a principal or other indemnitor to an AmTrust Party pursuant to an Indemnity Agreement (including as respects monies due, supplies, tools, plant and equipment, materials purchased or ordered for the performance of a contract, actions or causes of actions against subcontractors, laborers, materialmen or suppliers, rights under insurance policies, deposits or other funds to which a principal or indemnitor may be entitled in connection with any obligation covered by a Subject Bond, return premiums and powers of direction, appointment or revocation of any trust);

(h)   to prosecute any right or claim assigned or transferred to it with respect to an Indemnity Agreement, or acquired through subrogation, in the name of the principal or indemnitor, and to compromise or settle such claims as it deems reasonable under the circumstances;

(i)   to be the beneficiary of any grant of security interest by a principal or other indemnitor to an AmTrust Party pursuant to an Indemnity Agreement (including the right to file financing statements with respect to any security interest the assignee may have, at any time in any jurisdiction; provided that the failure to file such financing statements shall not release or discharge any obligations of an indemnitor or a principal);

(j)   the right to receive information reasonably requested of the principal or indemnitor, including regarding the status of work performed, the right to perform periodic examinations of the books, records and accounts of an indemnitor, and the right to receive such information from third parties;

(k)   the right to decline suretyship pursuant to an Indemnity Agreement as respects any new Bond, without incurring any liability to an indemnitor or principal;

(l)   the right to cause the indemnitor or principal pursuant to an Indemnity Agreement to seek exoneration of a Reinsured Bond; and

(m)   without limitation of any present appointment hereunder or pursuant to the Reinsurance Agreement, to be appointed or designated pursuant to an Indemnity Agreement as attorney-in-fact as respects an indemnitor or principal.

The parties further acknowledge and agree that the foregoing list is illustrative and in no way limits the rights conveyed pursuant to the Assignment.

SECTION 2.3   Limitation of Assignment.  If any term or provision of this Agreement would cause any AmTrust Party to lose any right granted by a principal or indemnitor pursuant to an Indemnity Agreement after giving effect to Sections 9-406 and 9-408 of the Uniform Commercial Code, such term or provision of this Agreement shall, as to such principal or indemnitor, be ineffective to the extent of such limitation of the rights granted pursuant to an Indemnity Agreement, in each case, without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement as respects any other principal or indemnitor.

SECTION 2.4   Power of Attorney.  The Direct Writers, as original attorneys-in-fact by virtue of authority given by power of attorney in each Indemnity Agreement, hereby

designate, appoint, and substitute Reinsurer and its Affiliates as attorney-in-fact to exercise the power of attorney granted to the Direct Writers in each Indemnity Agreement.

SECTION 2.5    All Necessary Actions.  The AmTrust Parties shall take all necessary, reasonable and appropriate actions, at Reinsurer's cost, to execute any additional documents, instruments or conveyances necessary to effectuate the Assignment or the provisions of this Agreement, including as may be necessary to enable Reinsurer, its Affiliates, or their respective successors and assigns to enforce in their own names, or in the name of an AmTrust Party, as applicable, the Assignment, each of the Indemnity Agreements and the rights of applicable AmTrust Party thereunder.

SECTION 2.6    Perfection.  The parties hereto intend that the Reinsurer, its Affiliates and their respective successors and assigns shall at all times have a first priority, perfected security interest with respect to the Assigned Property.  The AmTrust Parties shall execute and deliver UCC financing statements with respect to any and all Assigned Property to the Reinsurer, its Affiliates, or their respective successors and assigns that are deemed reasonably necessary by the Reinsurer, including to perfect the Assignment of the Assigned Property.

SECTION 2.7    Hold Harmless.  From and after the date of this Agreement, the Reinsurer shall defend, indemnify and hold harmless each of the Pool Retrocedents, ICC and CIC and each of their respective Affiliates (collectively, the "AmTrust Indemnitees") from and against, and pay or reimburse the AmTrust Indemnities for, any and all Losses (as defined in the Master Agreement) resulting from the Assignment with respect to the Liberty Bonds and any actions taken by the Reinsurer or its Affiliates in respect thereof, including the application of Collateral to the Liberty Bonds.

ARTICLE III

GENERAL PROVISIONS

SECTION 3.1    Interpretation.  The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The words "party" or "parties" shall refer to parties to this Agreement.  The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.  References to Articles and Sections are to Articles and Sections of this Agreement unless otherwise specified.  Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular.  The word "or" need not be disjunctive.  Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import.  "Writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form.  References to any agreement or contract are to that agreement or contract as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.  References to any Person include the successors and permitted assigns of that Person.  References from or through any date mean, unless otherwise specified, from and including or through and including, respectively.  Any

reference to "days" means calendar days unless Business Days are expressly specified.  If any action under this Agreement is required to be done or taken on a day that is not a Business Day, then such action shall be required to be done or taken not on such day but on the first succeeding Business Day thereafter.

SECTION 3.2    Entire Agreement.  This Agreement, the Master Agreement (including all exhibits, appendixes and schedules thereto), the Ancillary Agreements (when executed and delivered, including all exhibits, appendixes and schedules thereto, as applicable), the Confidentiality Agreement (as defined in the Master Agreement), the Exclusivity Agreement (as defined in the Master Agreement) and any other document delivered pursuant hereto or thereto, constitute the entire agreement and supersede all prior agreements, understandings and representations, both written and oral, between the parties with respect to the subject matter hereof and thereof.

SECTION 3.3    Governing Law, etc.

(a)    THIS   AGREEMENT   AND   THE   TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED IN ALL RESPECTS, INCLUDING AS TO VALIDITY, INTERPRETATION AND EFFECT, BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ITS PRINCIPLES OR RULES OF CONFLICT OF LAWS, TO THE EXTENT SUCH PRINCIPLES OR RULES ARE NOT MANDATORILY APPLICABLE BY STATUTE AND WOULD PERMIT OR REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.

(b)    EACH   PARTY   HEREBY   IRREVOCABLY   AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

SECTION 3.4    Assignment.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, successors and permitted assigns; provided that this Agreement shall not be assignable or otherwise transferable by any party without the prior written consent of the other party.

SECTION 3.5    Severability; Amendment; Modification; Waiver.

(a)    If any provision, including any phrase, sentence, clause, section or subsection, of this Agreement is determined by a court of competent jurisdiction to be invalid, inoperative or unenforceable for any reason, such circumstances shall not have the effect of rendering such provision in question invalid, inoperative or unenforceable in any other case or circumstance, or of rendering any other provision herein contained invalid, inoperative or unenforceable to any extent whatsoever.  Upon any such determination, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

(b)     No amendment, modification or discharge of this Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by the party against whom enforcement of the amendment, modification, discharge or waiver is sought. Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the party granting such waiver in any other respect or at any other time. Neither the waiver by any of the parties hereto of a breach of or a default under any of the provisions of this Agreement, nor the failure by any of the parties, on one or more occasions, to enforce any of the provisions of this Agreement or to exercise any right or privilege hereunder, shall be construed as a waiver of any other breach or default of a similar nature, or as a waiver of any of such provisions, rights or privileges hereunder. The rights and remedies herein provided are cumulative and none is exclusive of any other, or of any rights or remedies that any party may otherwise have at law or in equity.

SECTION 3.6     Counterparts; Effectiveness; Third Party Beneficiaries.  This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall together constitute one and the same instrument. This Agreement shall become effective when each party shall have received a counterpart hereof signed by all of the other parties. Until and unless each party has received a counterpart hereof signed by the other party, this Agreement shall have no effect and no party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication). No provision of this Agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder upon any Person other than the parties and their respective successors and assigns.

[*Remainder of page intentionally left blank*]

8

IN WITNESS WHEREOF, the AmTrust Parties and the Reinsurer have caused this Agreement to be signed by their respective duly authorized officers, all as of the date first written above.

**TECHNOLOGY INSURANCE COMPANY, INC.**

By: _____
    Name: Stephen B. Ungar
    Title:  Secretary

**DEVELOPERS SURETY AND INDEMNITY COMPANY**

By: _____
    Name: Stephen B. Ungar
    Title:  Secretary

**SECURITY NATIONAL INSURANCE COMPANY**

By: _____
    Name: Stephen B. Ungar
    Title:  Secretary

**WESCO INSURANCE COMPANY**

By: _____
    Name: Stephen B. Ungar
    Title:  Secretary

**INDEMNITY COMPANY OF CALIFORNIA**

By: _____
    Name: Stephen B. Ungar
    Title:  Secretary

*[Signature Page to the Assignment of Indemnity Rights Agreement]*

**COREPOINTE INSURANCE COMPANY**

By: _____

    Name: Stephen B. Ungar

    Title:  Secretary

**LIBERTY MUTUAL**
**INSURANCE COMPANY**

By: _____
Name: William Nicholas Garrett
Title: Managing Director, MFB

*[Signature Page to Assignment of Indemnity Rights Agreement]*